## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.

ABADE IRIZARRY and KYLE SHOCKLEY;
      Plaintiffs;

v.

THE CITY AND COUNTY OF DENVER, a municipality, LEE INGERSOLL, in his individual capacity, REGIONAL TRANSPORTATION DISTRICT, a political subdivision of the State of Colorado, and SCOTT WEBER, in his official capacity.
      Defendants.

---

### COMPLAINT AND JURY DEMAND

---

Plaintiffs Abade Irizarry and Kyle Shockley, by and through their attorney, E. Milo Schwab of Ascend Counsel, LLC, respectfully allege for their Complaint and Jury Demand as follows:

### INTRODUCTION

The Denver Police Department does not allow criticism of its officers. Throughout its history, the Denver Police have targeted community activists. For decades, they kept secret spy files on thousands of activists, protesters, and organizations. Much of this was aimed not at public safety, but at protecting their own interests. At every major protest event over the past twenty years, the Denver Police have continued this conduct, targeting journalists and activists who protest police violence, the treatment of the homeless by police, and other police misconduct.

But while the DNC protests, Occupy protests, and George Floyd protests gather the attention of the press, there are protests every week by a group of dedicated activists. They continually challenge police abuse and work to keep our government's failings in the public

attention. But without the cameras of the press trained on them, the Denver Police respond to these protests with malice. They arrest protesters because of their message. They arrest protesters because of their methods. And they arrest protesters for the very reason that these protesters are often calling out the worst abuses of our police on our most vulnerable citizens.

## JURISDICTION AND VENUE

1. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331 and 1343 because Plaintiffs' claims arise under federal statute and the U.S. Constitution.

2. Plaintiffs' injuries and Defendant's unlawful acts complained of herein occurred in the state of Colorado and therefore venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).

## PARTIES

3. Plaintiff Abade Irizarry is a citizen of the United States and a resident of the state of Colorado and was during the relevant times described herein.

4. Plaintiff Kyle Shockley is a citizen of the United States and a resident of the state of Colorado and was during the relevant times described herein.

5. Defendant City and County of Denver is a municipality in the state of Colorado.

6. Defendant Lee Ingersoll is a police officer with the Denver Police Department. He is being sued in his individual capacity.

7. Defendant Regional Transportation District is a political subdivision of the State of Colorado.

8. Defendant Scott Weber is a Regional Transportation District security officer. He is being used in his individual capacity.

9. All Defendants acted under color of state law at all times relevant to this Complaint.

## FACTUAL ALLEGATIONS

10. On June 2, 2019, Plaintiffs Abade Irizarry and Kyle Shockley, two veterans, went to the public plaza in front of Union Station along Wewatta Street to protest police violence and the criminalization of the homeless population by the city of Denver and the Denver police.

11. For twenty minutes, Mr. Irizarry and Mr. Shockley walked back and forth, through the plaza, chanting.

12. Mr. Irizarry began his protest by decrying how the homeless were treated.

13. Mr. Irizarry stated: "so while everybody else is enjoying this beautiful place here in Denver, the homeless don't get the same privilege, cause they're less than human. They get arrested for being here because they have no money."

14. Mr. Irizarry went on to state that homeless aren't allowed to even sit in our public spaces because of Mayor Hancock's urban camping ban. He then said "[t]he urban camping ban brings terrible treatment to the homeless … it criminalizes homeless families and children and women simply because they are poor."

15. Mr. Irizarry continued his protest by explaining that the Denver police department wakes up homeless people sleeping on the streets to harass them and to take their blankets, all to hand them a ticket for being too poor to have housing.

16. In discussing his service in the military fighting terrorists, Mr. Irizarry explained that he still sees "the Denver Police Department is a domestic terrorist group. They beat homeless, innocent, unarmed people. Marvin Booker was killed by the Denver Police

Department because he could not afford $100 bail. We have hundreds of people in jail because they can't afford $100 bail."

17. Throughout the entirety of Plaintiffs' protests, Mr. Shockley live streamed Mr. Irizarry's protests and commented as well on the failings of the Denver Police. For Mr. Shockley, a veteran of the war in Al-Fallujah, protesting was part of what he fought for - and that efforts to censor his speech were contrary to his sacrifices.

18. While Mr. Irizarry led the protest, Mr. Shockley followed with chants decrying police violence.

19. Plaintiffs' chanting included "No justice, no peace. Fuck the Police" and "Fuck the Police and Fuck RTD too."

20. Within minutes, security guards from Allied Universal, the private security organization hired by the Regional Transportation District, began following Mr. Irizarry and Mr. Shockley.

21. Mr. Irizarry then recounted how the Allied Universal security guards treated the homeless.

22. Throughout the remainder of Mr. Irizarry and Mr. Shockley's protest, the RTD police/security force told them to stop protesting and displayed force, following Plaintiffs and attempting to intimidate.

23. As Mr. Irizarry and Mr. Shockley continued their protesting, Mr. Irizarry, a veteran who took an oath to defend against enemies both foreign and domestic, stated that he considers a domestic enemy anyone who "beats my neighbors and takes away their

warmth and their shelter in the middle of the night - and puts them in a cage simply because they're poor."

24. At times, Mr. Irizarry and Mr. Shockley used profanity, but always as part of their expressive conduct and in defense of their right to protest police brutality and the inhumane treatment of our homeless neighbors at the hands of police. As an example, Mr. Irizarry stated "you see, I say that if doing bad is part of your family values, then I would have to say fuck your family values."

25. But Plaintiffs' protest was not only about the treatment of homeless Denver residents by the Denver Police - they had intentionally chosen Union Station as a forum to protest the conduct of the RTD-hired security guards.

26. It is well known in Denver that while Union Station has been called "Denver's Living Room." But it is only the "Living Room" for those who have money to spend.[1] As most people are aware, the spending requirement truly only applies to minorities and those who are or appear homeless.[2]

27. In one incident in 2018, of which Plaintiffs were aware, a Black man was beaten in a bathroom by security guards working for RTD at Union Station.

28. It was just this type of unjust behavior that Plaintiffs were there to protest.

29. But much as we saw the abusive behavior of Denver Police officers in the George Floyd protests of 2020 - dozens of videos of officers using chemical agents in response to disrespectful speech, far too many eyes lost and skulls broken by police punishing those

---

[1] The Public Owns Denver' Union Station But Now Only People With Money Can Lounge There, https://denverite.com/2020/02/24/the-public-owns-denvers-union-station-but-now-only-people-with-money-can-lounge-there/
[2] See *Stinnett v. Regional Transportation District*, 2020 WL 1870334 for a more detailed history of RTD's discriminatory behavior.

who called for police accountability, and countless other acts of violence meant to intimidate and counter peaceful calls for policing reform - these RTD officers engaged in aggressive confrontation, threatening Plaintiffs, and generally trying to intimidate Plaintiffs from continuing to protest police brutality and the treatment of homeless people.

30. Nonetheless, Plaintiffs continued their protest, bringing the uncomfortable truths of Denver's criminalization of homelessness to the public. Mr. Irizarry went on, stating that "what we're doing is, we're just spreading awareness in the public place."

31. Over the course of Plaintiff's twenty minute protest, the focus shifted from advocating for better treatment of Denver's homeless population to the very principle of free speech. Consistently, he was being told by RTD security guards that he was not allowed to protest in the public plaza in front of Union Station - never inside and instead at least twenty feet from the building.

32. Neither Mr. Irizarry nor Mr. Shockley ever engaged in violent behavior, they never threatened anyone, and they never engaged in any property destruction.

33. Nonetheless, the Denver Police arrived on scene on reports that these protesters were using offensive language.

34. Several Denver Police officers soon arrived at Union Station twenty minutes into Plaintiffs' protest against Denver's Urban Camping Ban and police brutality.

35. When Sergeant Ingersoll arrived, he spoke with RTD security guard Weber for approximately ten seconds. Ingersoll asked if "this is what he's (Irizarry) been doing?" in

response to Plaintiff's declaration of "Fuck the Police." Another RTD security guard responded "yeah, he's walking through the fountain cussing."

36. Arrest records indicate that Ingersoll used this statement by the second RTD security guard as the sole basis for his finding of probable cause.

37. That was it. That was the basis of Ingersoll's determination that he had probable cause to arrest Plaintiffs. He heard Plaintiff Irizarry say "Fuck the Police."

38. Without any warning or request for compliance, Ingersoll grabbed Irizarry's wrist and put him in handcuffs.

39. At the same time, Ingersoll directed Scott Weber, an RTD security guard, to arrest Mr. Shockley. In doing so, Mr. Weber grabbed Mr. Shockley's arm and twisted it behind his back.

40. Mr. Weber knew that this arrest was based solely on Plaintiff's exercise of his First Amendment Rights and that no probable cause existed to permit an arrest. Mr. Weber also knew that the force with which he used to effectuate the arrest was objectively unreasonable. No commands were given for compliance - instead Weber immediately resorted to force.

41. Ingersoll then stated that Plaintiffs were being arrested for trespassing and disturbing the peace.

42. Ingersoll, having arrested Mr. Irizarry and directed the arrest of Mr. Shockley then walked Mr. Shockley to a Denver police car.

43. While at the police car, Plaintiffs were patted down and searched. Mr. Shockley repeatedly stated "I do not consent to this search." Mr. Irizarry also told the Denver police that he did not consent to a search.

44. Ingersoll was never under any misunderstanding. He knew that the Plaintiffs had been protesting on public sidewalks in a public plaza.

45. He knew that there was no violence - nor even a threat of violence.

46. He arrested Plaintiffs solely because people were uncomfortable with Plaintiffs' protests against police violence meted out by Denver police - often directed at our homeless population.

47. He did not observe Plaintiffs' protest - he was not present long enough. He simply heard that they were "cussing" and decided that this protest needed to be stopped.

48. According to the Downtown Denver Partnership, "Wynkoop Plaza at Denver Union Station features approximately 30,000 square feet of public space just outside the doors of Denver's multi-modal transit hub featuring vibrant restaurants and retail."

49. In fact, it is hard to imagine a more fitting example of a traditional public forum than an outdoor plaza outside the train station which played such an important role in the development of the city of Denver.

50. Nonetheless, the Denver Police do not appreciate those that call for police reform. As we saw last year, the Denver Police engaged in a campaign to retaliate against those calling out police racism and brutality.

51. The Denver Police's response to the George Floyd protests was so violent and so clearly based in punishment for protesters daring to speak out against police misconduct that the

Denver Police were subjected to a first in the nation restraining order. Judge Jackson called their conduct disgusting.

52. But what we now know and learned in 2020 was not conduct that began in 2020. The Denver Police harbored this same entitlement to use the power of the state to punish those who called out police misconduct for years.

53. When Mr. Shockley told Ingersoll that Ingersoll was arresting him for doing something he is constitutionally allowed to do, Ingersoll responded: "Come out here and ruin everybodies' day?"

54. And unfortunately, as with the Denver Police officers who bragged that they were ready to "start a riot," Sargent Ingersoll said the quiet part out loud.

55. Mr. Irizarry and Mr. Shockley were not being arrested because of language likely to incite violence - they were being arrested because their public protest was making others uncomfortable. Quite literally, they were ruining other people's brunches with their calls to end the criminalization of homelessness. The Denver Police arrested Plaintiffs because they found the form of Plaintiff's expression to be offensive.

56. Two days later, on June 4, 2019, Plaintiff Irizarry returned to Wynkoop Plaza to protest the Denver Police violating his First Amendment right to protest.

57. Almost immediately, four officers came down to confront Mr. Irizarry. Nonetheless, Mr. Irizarry continued his protest, calling out police killings and the ways in which the Denver Police have taken actions to quiet those who speak out against their misconduct.

58. Again, Ingersoll arrested Mr. Irizarry.

59. Since Mr. Irizarry hadn't been intimidated by his previous arrest, Mr. Ingersoll declared that Mr. Irizarry was now guilty of a felony - attempting to intimidate witnesses.

60. Mr. Irizarry had spoken with no witnesses who had been present at the previous protest. In fact, it was two days later and those present for a Sunday brunch were unlikely to be at the same spot on a Tuesday afternoon.

61. Mr. Irizarry had only been engaged in a protest, which may have been vulgar at times, but was never threatening.

62. But without any probable cause, Ingersoll decided to step up his retaliation and efforts at intimidation and charge Mr. Irizarry with a felony.

63. Months after Mr. Irizarry was arrested and detained at the Denver County Jail, this charge was dropped.

64. But Ingersoll had achieved his purpose - to declare that he could arrest those who protest police violence with a felony.

## MUNICIPAL LIABILITY

65. The Denver Police have a history of targeting activists and protesters. The Denver Police do not like protesters, and they have a special ire for those who protest police abuses. This history of targeting and retaliation amounts to a custom, policy, or practice of arresting, intimidating, or otherwise retaliating against protesters and journalists for engaging in speech activity including speech that is critical of the police at public places in the City of Denver.

66. For decades, the Denver Police maintained a list of known activists and protesters with secret spy files on more than 3,200 people and 208 organizations. For most of these

people and organizations, their only conduct was attending peaceful demonstrations. The Denver Police kept files on them anyway. During this period, Denver Police officers spied on certain protest leaders. Ultimately, the Denver Police agreed to end certain practices aimed at policing free-speech activities.[3]

67. This however, was not the end of the Denver Police's targeting of activists and demonstrators. Denver now monitors the social media accounts of activists.[4]

68. On the evening of August 25, 2009, during the Democratic National Convention, a solid line of riot-equipped police shut down a peaceful protest march as it proceeded on 15th street in downtown Denver. A second line of riot cops encircled the protesters and conducted a mass arrest of those protesters for marching without a permit. Without probable cause, the Denver Police arrested 96 peaceful protesters. The Denver Police charged the protesters with failing to observe a dispersal order, even though they later acknowledged that no such order was ever given. Nonetheless, the Denver Police continued to target these protesters, refusing to drop the charges. The protesters eventually prevailed on these charges and brought a civil rights action. *Acks v. Denver*, 1:09cv02197. Denver later agreed to a Class Action settlement for depriving these protesters of their constitutional rights.

---

[3] ACLU Press Release: ACLU and Denver Officials Agree to Resolve Lawsuit Over Notorious Police "Spy Files", April 17, 2003,
https://www.aclu.org/press-releases/aclu-and-denver-officials-agree-resolve-lawsuit-over-notorious-police-spy-files
[4] Denver Police Use Social Media to Follow Activists, Bring Back Fears of Spy Files, Westword Magazine, January 17,2017,
https://www.westword.com/news/denver-police-use-social-media-to-follow-activists-bring-back-fears-of-spy-files-8696953

69. In the fall of 2011, the Denver Police targeted Occupy protesters, arresting dozens and deploying pepper balls in response to peaceful protests. Many of those demonstrators would continue to protest Denver Police violence and the treatment of the homeless for the years to come.

70. On or about September 11, 2013, Bruce Baumann attended a public event on the University of Denver campus in remembrance of 9/11. One of the speakers was former Senator Joseph Lieberman. While Senator Lieberman was speaking, Mr. Baumann stood up and began asking Mr. Lieberman a series of questions. Throughout these questions, Mr. Baumann was exercising his First Amendment rights. Soon thereafter, Mr. Baumann was asked to leave, with which he immediately complied. A Denver police officer, not liking the content of Mr. Baumann's message, arrested him. The criminal charge of Disturbing the Peace was later dropped. After losing a Motion to Dismiss on a federal civil rights case arising out of this incident, the City of Denver settled this case.

71. On August 14, 2014, Levi Frasier witnessed DPD officers punch an unarmed civilian numerous times in the head and trip a heavily pregnant woman, causing her to fall to the ground. Believing the officers were committing illegal acts of misconduct, Mr. Frasier video-recorded the officers with his tablet. Upon seeing Mr. Frasier recording, DPD officers surrounded Mr. Frasier, threatened him with arrest, and demanded he turn over his video. Mr. Frasier refused, and a DPD officer seized his tablet from him and searched it illegally. On the plaintiff's motion to reconsider, Judge Blackburn of the U.S. District Court for the District of Colorado reinstated the plaintiff's First Amendment retaliation claims against the officer defendants and granted Denver's motion for summary

judgment. Despite Denver's policy and training on the First Amendment, the officers nonetheless violated Mr. Frasier's First Amendment right to gather and record information on matters of public concern.

72. In July 2015, Eric Brandt and Mark Iannicelli began handing out fliers regarding the concept of jury nullification in front of the Lindsey-Flanigan Courthouse in Denver. On August 26, 2015,

73. On July 5, 2018, Susan Greene, a journalist, was driving to the bank when she saw a black man handcuffed and naked on the sidewalk across from the State Capitol Building surrounded by DPD officers. Concerned as a public citizen and journalist by the questionable appearance of an African-American man unclothed, nonthreatening, and in handcuffs, Ms. Greene parked her vehicle and began to take pictures on a public sidewalk where she was not obstructing police investigation. DPD officers told her to stop. Ms. Greene stated that it was a public sidewalk and that she had the right to take photos. The officers falsely accused Ms. Greene of violating the arrestee's HIPAA rights and of blocking the door to an ambulance. The officers then forcefully and painfully arrested Ms. Greene in retaliation for exercising her First Amendment right to photograph the police on a public sidewalk, and handcuffed her for ten minutes before releasing her. Ms. Greene was never charged with a crime. Ms. Greene's First Amendment, First Amendment retaliation, and Fourth Amendment excessive force claims against Denver and DPD officers were settled in August 2019 for $50,000 in addition to mandating First Amendment training for DPD officers.

74. On September 23, 2018, Caryn Sodaro, an outspoken advocate for the homeless, was arrested by DPD Officers for alleged trespassing while handing out meals to the homeless and protesting on a public sidewalk on the Sixteenth Street Mall. Ms. Sodaro claimed she was never provided with a trespass notice advising her that she was not permitted to be on the property, and instead, officers arrested her in retaliation for engaging in First Amendment protected activity. Ms. Sodaro was cited for trespass and detained at the Denver Detention Center. Her case is currently ongoing.

75. Again on September 23, 2018, Brian Loma and Mikel Whitney were on the 16th Street Mall distributing meals to the homeless with Ms. Sodaro. Shortly after Ms. Sodaro's arrest, Mr. Loma decried the treatment of homeless people - "what we have here [are] … laws that criminalize people who can't pay rent. They don't want your tourist dollars to recognize that we have problems in this city! The laws say that if you're not paying money, you can't sit down." As he continued, Mr. Loma shouted "fuck the police!" He was immediately arrested for disturbing the peace. Mr. Loma and Mr. Whitney have filed a 1983 civil rights claim which is currently ongoing.

76. On September 24, 2018, Eric Brandt was in the Sixteenth Street Mall protesting the arrests of Ms. Sodaro, Mr. Loma, and Ms. Whitney. Mr. Brandt stood on a public sidewalk and shouted, "we want justice for Caryn Sodaro! Caryn Sodaro is a political prisoner for free speech!" Defendant Kitchens, Defendant Cpl. Chavez, and three other officers were present and closely watching Mr. Brandt. Defendant Kitchens expressed his annoyance and stated loud enough for other people in the mall to hear, "unfortunately, we can't be offended, but if a private citizen is willing to sign a complaint, I'd be happy to

arrest him." A woman standing nearby stated that she was offended and would sign a complaint. Defendants Kitchens and Cpl. Chavez then arrested Mr. Brandt in retaliation for his protected speech and cited him with disturbing the peace. Upon making the arrest, Defendant Cpl. Chavez radioed Defendant Guzman explaining that they had Mr. Brandt in custody and that a private citizen was willing to sign a complaint against him. Guzman explained that as long as they had one signed complaint against him, then the arrest was ok. After spending two days in jail, Mr. Brandt was released and his charge was dropped the next day, on September 27, 2018.

77. On May 28, 2020, Agazi Abay, Gabriel Thorn, Amy Schneider, Michael McDaniel, and other similarly situated Plaintiffs protested in Denver to express their outrage at the death of George Floyd and other acts of violence perpetrated by police officers against the African American community. During the demonstration, DPD officers violated the plaintiffs' First Amendment right to free speech and their Fourth Amendment right against excessive force by using pepper spray, pepper balls, rubber bullets, flashbang grenades, and tear gas to punish the plaintiffs for demonstrating against police brutality. On June 5, 2020, Judge Brooke Jackson of the U.S. District Court of the District of Colorado found the defendants in violation of the plaintiffs' First and Fourth Amendment rights and issued a temporary restraining order to enjoin Denver and DPD from employing chemical weapons or projectiles of any kind against persons engaging in peaceful protest.

78. In addition to the brutalization of protestors, DPD officers have also repeatedly used unlawful, excessive force against journalists in violation of the First Amendment. On

June 1, 2020, members of the Colorado Freedom of Information Coalition, Colorado Press Association Network, Colorado Broadcasters Association, and Colorado Pro Chapter of the Society of Professional Journalists reported seven journalists or reporters had been subjected to use of force by DPD officers while reporting on protests in Denver. DPD officers hit these reporters with pepper balls, projectiles, or tear gas simply for being present at protests in violation of the First Amendment.

79. These are only a select few of the stories of Denver Police targeting protesters, whether for their viewpoint, the manner in which these protesters communicated their message, or simply because the Denver Police do not like the act of protesting.

80. Upon information and belief, the Denver Police have engaged in a concerted effort to target a few of these individuals and their associates, including Eric Brandt, Kyle Shockley, and Abade Irizarry.

81.  Given Denver's history and widespread practice of unlawful arrests and excessive force in retaliation against the exercise of First Amendment rights, Defendant Denver knew of the need to provide additional or better training and supervision in this respect and made a deliberate choice to not adequately train and supervise DPD officers on the protections of the First Amendment violations.

82. Defendant Denver knew or should have known that its acts or omissions in this regard were substantially certain to cause DPD officers to violate individuals' constitutional rights, and it consciously or deliberately chose to disregard this obvious risk of harm in adhering to the policy and custom of failing to provide additional or better training and supervision to DPD officers regarding the protections of First Amendment.

83. Defendant Denver could have and should have pursued reasonable methods for the training and supervising of such employees, or disciplining them if they engaged in misconduct, but intentionally chose not to do so.

84. Defendant Denver's custom, practice, and policy of encouraging, condoning, and ratifying the use of arrests or other retaliatory conduct against those who exercise their First Amendment rights, and their custom, policy, and practice of failing to properly train, supervise, and discipline DPD employees despite such history and knowledge or constructive knowledge of such history, were the moving force and proximate cause of the violations of Plaintiffs' constitutional rights.

85. Defendant Denver engaged in this conduct intentionally, knowingly, willfully, wantonly, maliciously, and in reckless disregard of Plaintiffs' constitutional rights.

86. Defendant Denver's acts or omissions caused Plaintiffs' damages through their deprivation of liberty through retaliatory arrest and incarceration, and where they suffered mental pain, humiliation, fear, anxiety, loss of enjoyment of life, and sense of security and individual dignity, among other injuries, damages, and losses.

## REGIONAL TRANSPORTATION DISTRICT LIABILITY

87. Union Station is advertised as "Denver's Living Room." In fact, it is a space, which, while public and owned by the public, is tightly guarded with policies aimed at excluding the homeless population.

88. Much as Denver has an urban camping ban, RTD excludes the homeless from its spaces.

89. RTD enforces these policies through the use of uniformed RTD Transit Security Officers (TSOs) who act as gatekeepers and control the behavior allowed both inside and outside Union Station.

90. The plaza in front of Union Station has long been a public forum. Every Sunday, there is a farmers market. The Children's Climate protest on October 11, 2019 started in the plaza.

91. Many other protests either begin, end, or pause in Denver's front yard to express their message.

92. TSOs however, enforce their policies in a non-viewpoint neutral manner.

93. On June 2, 2019, TSO Weber engaged in conduct, including participating in the arrest of Plaintiff Shockley, based not on neutral standards, but because he either did not like the message that Plaintiffs were expressing or he did not like the manner in which they expressed it.

94. He utilized his position as a security officer for RTD to dictate what messages are allowed in this public forum, silencing Plaintiffs from protesting on an important matter of public concern.

95. RTD' security team is overwhelmingly comprised of TSOs.

96. Under Colorado law, fare inspectors may issue citations "on behalf of the county in which the [offender] is located at the time the violation is discovered." C.R.S. § 42-4-1416(4)(a).

97. Thus, the TSOs at Union Station were delegated authority under state law to issue citations for fare violations on behalf of Denver County.

98. In addition to enforcing RTD policy and state law, the TSOs were clothed with the authority of official RTD agents.

99. Explicit affiliation between RTD and its TSOs was both required by contract and reflected by the badges and insignia worn by the TSOs.

100.    The TSOs were required to wear badges on their uniforms identifying themselves as a "RTD Transit Security Officer" and prominently displaying the RTD Logo in red.

### STATEMENT OF CLAIMS

### CLAIM I
### 42 U.S.C. § 1983. - UNLAWFUL ARREST
### (PLAINTIFF IRIZARRY AGAINST DEFENDANTS INGERSOLL AND CITY OF DENVER)

101.    Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs, as though fully set forth herein.

102.    Mr. Irizarry was arrested on June 2, 2019 for protesting homelessness and for saying the phrase "Fuck the Police."

103.    Ingersoll relied only on hearing Mr. Irizarry say "Fuck the Police" and a comment from an RTD security guard that Plaintiffs had been "cussing."

104.    Ingersoll never witnessed any violence, nor encountered any use of fighting words. Indeed, he did not inquire as to whether any words were uttered which might be construed as fighting words.

105.    Ingersoll stated that he was arresting Plaintiff Irizarry because Irizarry's protests and the use of the word "Fuck" was ruining "everybody's day."

106.    It was unreasonable for any police officer to believe that he could arrest someone for protesting in a public forum simply because it was ruining other people's day.

107.    At all times, Defendant Ingersoll was acting under color of state law.

108.    Defendant's conduct violated clearly established rights belonging to Plaintiff of which a reasonable person in their positions knew or should have known.

109.    It is the custom, policy, or practice of the City of Denver to arrest activists for protest conduct, including when such protest conduct is directed at police misconduct.

110.    The acts and omissions of Defendant Ingersoll were engaged in pursuant to the customs, policies, and practices of Defendant City of Denver, which encourages, condones, tolerates, and ratifies the restraint of speech and expressive activity by law enforcement officers of individuals expressing viewpoints critical of Defendant City of Denver and/or its officials and/or exercising their rights of free speech and dissent through arrests without probable cause.

111.    Defendant's actions caused, directly and proximately, Plaintiff to suffer damages.

## CLAIM II
### 42 U.S.C. § 1983. - UNLAWFUL ARREST
### (PLAINTIFF IRIZARRY AGAINST DEFENDANTS INGERSOLL AND CITY OF DENVER)

112.    Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs, as though fully set forth herein.

113.    Mr. Irizarry was arrested on June 4, 2019 for protesting homelessness and the Denver Police Department.

114.    Defendant Ingersoll spoke with no one, arresting Mr. Irizarry simply because he was protesting the Denver Police in the Union Station Plaza after Defendant Ingersoll had already attempted to punish him for protesting in a place where tourists congregate.

115.    Defendant Ingersoll never witnessed any violence, nor encountered any use of

fighting words. Indeed, he did not inquire as to whether any words were uttered which might be construed as fighting words.

116.    Defendant Ingersoll did not speak with anyone and based his arrest of Mr. Irizarry simply for returning to Union Station when Defendant Inersol had already declared such protests to be unlawful.

117.    Defendant Ingersoll had no basis for believing that Mr. Irizarry had attempted to or intended to, intimidate any witness. Nonetheless, Defendant Ingersoll searched for a more punishing criminal sanction than disturbing the peace. Defendant Ingersoll had no reasonable basis for probable cause that Mr. Irizarry had intimidated a witness. Defendant Ingersoll simply made it up.

118.    At all times, Defendant Ingersoll was acting under color of state law.

119.    Defendant's conduct violated clearly established rights belonging to Plaintiff of which a reasonable person in their positions knew or should have known.

120.    It is the custom, policy, or practice of the City of Denver to arrest activists for protest conduct, including when such protest conduct is directed at police misconduct.

121.     The acts and omissions of Defendant Ingersoll were engaged in pursuant to the customs, policies, and practices of Defendant City of Denver, which encourages, condones, tolerates, and ratifies the restraint of speech and expressive activity by law enforcement officers of individuals expressing viewpoints critical of Defendant City of Denver and/or its officials and/or exercising their rights of free speech and dissent through arrests without probable cause.

122.    Defendant's actions caused, directly and proximately, Plaintiff to suffer damages.

## CLAIM III

**42 U.S.C. § 1983. - UNLAWFUL ARREST**

**(PLAINTIFF SHOCKLEY AGAINST ALL DEFENDANTS)**

123.    Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs, as though fully set forth herein.

124.    Mr. Shockley was arrested on June 2, 2019 for protesting homelessness and for saying the phrase "Fuck the Police."

125.    Ingersoll relied only on hearing Mr. Shockley say "Fuck the Police" and a comment from an RTD security guard that both Plaintiffs had been "cussing."

126.    Ingersoll never witnessed any violence, nor encountered any use of fighting words. Indeed, he did not inquire as to whether any words were uttered which might be construed as fighting words.

127.    Ingersoll stated that he was arresting Plaintiffs because their protests and the use of the word "Fuck" was ruining "everybody's day."

128.    It was unreasonable for any police officer to believe that he could arrest someone for protesting in a public forum simply because it was ruining other people's day.

129.    At all times, Defendant Ingersoll was acting under color of state law.

130.    Defendant's conduct violated clearly established rights belonging to Plaintiff of which a reasonable person in their positions knew or should have known.

131.    It is the custom, policy, or practice of the City of Denver to arrest activists for protest conduct, including when such protest conduct is directed at police misconduct.

132.     The acts and omissions of Defendant Ingersoll were engaged in pursuant to the customs, policies, and practices of Defendant City of Denver, which encourages, condones, tolerates, and ratifies the restraint of speech and expressive activity by law

enforcement officers of individuals expressing viewpoints critical of Defendant City of Denver and/or its officials and/or exercising their rights of free speech and dissent through arrests without probable cause.

133.    Defendants' actions caused, directly and proximately, Plaintiff to suffer damages.

### CLAIM IV

### 42 U.S.C. § 1983. - FIRST AMENDMENT - VIOLATION REGARDING FREE SPEECH (PLAINTIFF IRIZARRY AGAINST DEFENDANTS INGERSOLL, RTD, AND CITY OF DENVER)

134.    Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs, as though fully set forth herein.

135.    Plaintiff Irizarry's communications of messages during the entirety of his protest on June 2, 2020 were expressive activities protected by the First Amendment.

136.    Plaintiff's communication did not violate any law.

137.    Defendants' arrest and citation of Plaintiff is a content-based or viewpoint-based restriction on speech, or both.

138.    Plaintiff's arrest was a denial of his right to free speech guaranteed by the First Amendment to the Constitution of the United States.

139.    By arresting Plaintiff, Defendants, prevented Plaintiff from speaking out on a matter of public concern.

140.    By charging, investigating, and prosecuting Plaintiff for his constitutionally-protected expressive activity, Defendants have chilled Plaintiff from exercising his First Amendment rights.

141.    Plaintiff was prevented from speaking out on a matter of public concern while standing in a public place in the City of Denver, Colorado.

142.   The actions of Defendants occurred while each was acting under color of State law.

143.   Defendants' conduct violated clearly established rights belonging to Plaintiff of which a reasonable person in Defendants' position knew or should have known.

144.   It is the custom, policy, or practice of the City of Denver to arrest activists for protest conduct, including when such protest conduct is directed at police misconduct.

145.    The acts and omissions of Defendant Ingersoll were engaged in pursuant to the customs, policies, and practices of Defendant City of Denver, which encourages, condones, tolerates, and ratifies the restraint of speech and expressive activity by law enforcement officers of individuals expressing viewpoints critical of Defendant City of Denver and/or its officials and/or exercising their rights of free speech and dissent.

146.   Plaintiff was prevented by Defendants from delivering his message in violation of the First Ame to the United State Constitution.

147.   Defendants' actions caused, directly and proximately, Plaintiff to suffer damages.

## CLAIM V
### 42 U.S.C. § 1983. - FIRST AMENDMENT - VIOLATION REGARDING FREE SPEECH
### (PLAINTIFF IRIZARRY AGAINST DEFENDANTS INGERSOLL, RTD, AND CITY OF DENVER)

148.   Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs, as though fully set forth herein.

149.   Plaintiff Irizarry's communications of messages during the entirety of his protest on June 4, 2020 were expressive activities protected by the First Amendment.

150.   Plaintiff's communication did not violate any law.

151.   Defendants' arrest and citation of Plaintiff is a content-based or viewpoint-based restriction on speech, or both.

152.    Plaintiff's arrest was a denial of his right to free speech guaranteed by the First Amendment to the Constitution of the United States.

153.    By arresting Plaintiff, Defendants prevented Plaintiff from speaking out on a matter of public concern.

154.    By charging, investigating, and prosecuting Plaintiff for his constitutionally-protected expressive activity, Defendants have chilled Plaintiff from exercising his First Amendment rights.

155.    Plaintiff was prevented from speaking out on a matter of public concern while standing in a public place in the City of Denver, Colorado.

156.    The actions of Defendants occurred while each was acting under color of State law.

157.    Defendants' conduct violated clearly established rights belonging to Plaintiff of which a reasonable person in Defendants' position knew or should have known.

158.    It is the custom, policy, or practice of the City of Denver to arrest activists for protest conduct, including when such protest conduct is directed at police misconduct.

159.     The acts and omissions of Defendant Ingersoll were engaged in pursuant to the customs, policies, and practices of Defendant City of Denver, which encourages, condones, tolerates, and ratifies the restraint of speech and expressive activity by law enforcement officers of individuals expressing viewpoints critical of Defendant City of Denver and/or its officials and/or exercising their rights of free speech and dissent.

160.    Plaintiff was prevented by Defendants from delivering his message in violation of the First Amendment to the United State Constitution.

161.    Defendants' actions caused, directly and proximately, Plaintiff to suffer damages.

**CLAIM VI**

**42 U.S.C. § 1983. - First Amendment - Violation Regarding Free Speech**
**(Plaintiff Shockley Against Defendants Ingersoll, RTD, and City of Denver)**

162.    Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs, as though fully set forth herein.

163.    Plaintiff Shockley's communications of messages during the entirety of his protest on June 2, 2020 were expressive activity protected by the First Amendment.

164.    Plaintiff's communication did not violate any law.

165.    Defendants' arrest and citation of Plaintiff is a content-based or viewpoint-based restriction on speech, or both.

166.    Plaintiff's arrest was a denial of his right to free speech guaranteed by the First Amendment to the Constitution of the United States.

167.    By arresting Plaintiff, Defendants prevented Plaintiff from speaking out on a matter of public concern.

168.    By charging, investigating, and prosecuting Plaintiff for his constitutionally-protected expressive activity, Defendants have chilled Plaintiff from exercising his First Amendment rights.

169.    Plaintiff was prevented from speaking out on a matter of public concern while standing in a public place in the City of Denver, Colorado.

170.    The actions of Defendants occurred while each was acting under color of State law.

171.    Defendants' conduct violated clearly established rights belonging to Plaintiff of which a reasonable person in Defendants' position knew or should have known.

172.    It is the custom, policy, or practice of the City of Denver to arrest activists for protest conduct, including when such protest conduct is directed at police misconduct.

173.    The acts and omissions of Defendant Ingersoll were engaged in pursuant to the customs, policies, and practices of Defendant City of Denver, which encourages, condones, tolerates, and ratifies the restraint of speech and expressive activity by law enforcement officers of individuals expressing viewpoints critical of Defendant City of Denver and/or its officials and/or exercising their rights of free speech and dissent.

174.    Plaintiff was prevented by Defendants from delivering his message in violation of the First Ame to the United State Constitution.

175.    Defendants' actions caused, directly and proximately, Plaintiff to suffer damages.

### CLAIM VII
### 42 U.S.C. § 1983. - FIRST AMENDMENT RETALIATION
### (PLAINTIFF IRIZARRY AGAINST DEFENDANTS INGERSOLL AND CITY OF DENVER)

176.    Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs, as though fully set forth herein.

177.    Plaintiff engaged in First Amendment protected activity by conducting a protest of police brutality and Denver's camping ban on June 2, 2021 in a public place in the City of Denver, Colorado.

178.    Plaintiff's speech and expression were related to matters of public concern.

179.    Defendant Ingersoll responded to Plaintiff's First Amendment-protected activity with retaliation, including but not limited to arrest Plaintiff and charging Plaintiff with disturbing the peace without probable cause to believe that Plaintiff had engaged in illegal conduct, and charging, investigating, and prosecuting Plaintiff for his constitutionally-protected expressive activity.

180.    Defendants' retaliatory actions were substantially motivated by Plaintiff's exercise of

his First Amendment rights.

181.   By unlawfully citing, arresting, and causing the continued prosecution of Plaintiff, Defendant has sought to punish Plaintiff for exercising his First Amendment rights to protest the police and to silence his future speech and restrict his freedom of expression, and the future speech and expression of others. Defendant's retaliatory actions would chill a person of ordinary firmness from engaging in such First Amendment-protected activity.

182.   Defendant's conduct violated clearly established rights belonging to Plaintiff of which a reasonable person in Defendant's position knew or should have known.

183.   It is the custom, policy, or practice of the City of Denver to arrest activists for protest conduct, including when such protest conduct is directed at police misconduct.

184.    The acts and omissions of Defendant Ingersoll were engaged in pursuant to the customs, policies, and practices of Defendant City of Denver, which encourages, condones, tolerates, and ratifies the restraint of speech and expressive activity by law enforcement officers of individuals expressing viewpoints critical of Defendant City of Denver and/or its officials and/or exercising their rights of free speech and dissent.

185.   Defendants engaged in this conduct intentionally, knowingly, willfully, wantonly, maliciously, and in reckless disregard of Plaintiff's constitutional rights.

186.   At all times relevant to this Complaint, Defendants were acting under color of state law.

187.   Defendants' actions caused, directly or proximately, Plaintiff to suffer damages.

## CLAIM VIII
### 42 U.S.C. § 1983. - FIRST AMENDMENT RETALIATION
### (PLAINTIFF IRIZARRY AGAINST DEFENDANTS INGERSOLL AND CITY OF DENVER)

188.   Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs, as though fully set forth herein.

189.   Plaintiff engaged in First Amendment protected activity by conducting a protest of police brutality and Denver's camping ban on June 4, 2021 in a public place in the City of Denver, Colorado.

190.   Plaintiff's speech and expression were related to matters of public concern.

191.   Defendant Ingersoll responded to Plaintiff's First Amendment-protected activity with retaliation, including but not limited to arrest Plaintiff and charging Plaintiff with disturbing the peace without probable cause to believe that Plaintiff had engaged in illegal conduct, and charging, investigating, and prosecuting Plaintiff for his constitutionally-protected expressive activity.

192.   Defendants' retaliatory actions were substantially motivated by Plaintiff's exercise of his First Amendment rights.

193.   By unlawfully citing, arresting, and causing the continued prosecution of Plaintiff, Defendants have sought to punish Plaintiff for exercising his First Amendment rights to protest the police and to silence his future speech and restrict his freedom of expression, and the future speech and expression of others. Defendant's retaliatory actions would chill a person of ordinary firmness from engaging in such First Amendment-protected activity.

194.   Defendants' conduct violated clearly established rights belonging to Plaintiff of which a reasonable person in Defendant's position knew or should have known.

195.   It is the custom, policy, or practice of the City of Denver to arrest activists for protest

conduct, including when such protest conduct is directed at police misconduct.

196.    The acts and omissions of Defendant Ingersoll were engaged in pursuant to the customs, policies, and practices of Defendant City of Denver, which encourages, condones, tolerates, and ratifies the restraint of speech and expressive activity by law enforcement officers of individuals expressing viewpoints critical of Defendant City of Denver and/or its officials and/or exercising their rights of free speech and dissent.

197.    Defendants engaged in this conduct intentionally, knowingly, willfully, wantonly, maliciously, and in reckless disregard of Plaintiff's constitutional rights.

198.    At all times relevant to this Complaint, Defendant was acting under color of state law.

199.    Defendant's actions caused, directly or proximately, Plaintiff to suffer damages.

## CLAIM IX
### 42 U.S.C. § 1983. - FIRST AMENDMENT RETALIATION
#### (PLAINTIFF SHOCKLEY AGAINST DEFENDANTS INGERSOLL AND CITY OF DENVER)

200.    Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs, as though fully set forth herein.

201.    Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs, as though fully set forth herein.

202.    Plaintiff engaged in First Amendment protected activity by conducting a protest of police brutality and Denver's camping ban on June 2, 2021 in a public place in the City of Denver, Colorado.

203.    Plaintiff's speech and expression were related to matters of public concern.

204.    Defendant Ingersoll responded to Plaintiff's First Amendment-protected activity with retaliation, including but not limited to arrest Plaintiff and charging Plaintiff with

disturbing the peace without probable cause to believe that Plaintiff had engaged in illegal conduct, and charging, investigating, and prosecuting Plaintiff for his constitutionally-protected expressive activity.

205.    Defendants' retaliatory actions were substantially motivated by Plaintiff's exercise of his First Amendment rights.

206.    By unlawfully citing, arresting, and causing the continued prosecution of Plaintiff, Defendant has sought to punish Plaintiff for exercising his First Amendment rights to protest the police and to silence his future speech and restrict his freedom of expression, and the future speech and expression of others. Defendant's retaliatory actions would chill a person of ordinary firmness from engaging in such First Amendment-protected activity.

207.    Defendants' conduct violated clearly established rights belonging to Plaintiff of which a reasonable person in Defendant's position knew or should have known.

208.    It is the custom, policy, or practice of the City of Denver to arrest activists for protest conduct, including when such protest conduct is directed at police misconduct.

209.     The acts and omissions of Defendant Ingersoll were engaged in pursuant to the customs, policies, and practices of Defendant City of Denver, which encourages, condones, tolerates, and ratifies the restraint of speech and expressive activity by law enforcement officers of individuals expressing viewpoints critical of Defendant City of Denver and/or its officials and/or exercising their rights of free speech and dissent.

210.    Defendant engaged in this conduct intentionally, knowingly, willfully, wantonly, maliciously, and in reckless disregard of Plaintiff's constitutional rights.

211.    At all times relevant to this Complaint, Defendant was acting under color of state law.

212.    Defendant's actions caused, directly or proximately, Plaintiff to suffer damages.

WHEREFORE, Plaintiffs Abade Irizarry and Kyle Shockley respectfully request that this Court enter judgment in their favor and against the Defendants as follows:

(i)        Appropriate declaratory and other injunctive and/or equitable relief;

(ii)       Compensatory and consequential damages, including damages for emotional distress, loss of reputation, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

(iii)      All economic losses on all claims allowed by law;

(iv)      Punitive damages on all claims allowed by law and in an amount to be determined at trial;

(v)       Pre and Post-Judgment Interest;

(vi)      Attorney's fees and the costs associated with this action, including those associated with having to defend against the false criminal charge as well as expert witness fees, on all claims allowed by law; and

(vii)     Any other relief the Court deems appropriate.

PLAINTIFFS DEMAND A JURY TRIAL ON ALL ISSUES SO TRIABLE.

Respectfully submitted this 2nd day of June 2021.

s/ Edward Milo Schwab
Edward Milo Schwab, #47897
Ascend Counsel, LLC
3000 Lawrence Street
Denver, CO 80205
(303) 888-4407
milo@ascendcounsel.co

ATTORNEY FOR PLAINTIFFS