IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Case No. 21-cv-01490-PAB-SKC

ABADE IRIZARRY, and
KYLE SHOCKLEY,

      Plaintiffs,

v.

THE CITY AND COUNTY OF DENVER, a municipality,
LEE INGERSOLL, in his individual capacity,
REGIONAL TRANSPORTATION DISTRICT, a political subdivision of the State of
Colorado, and
SCOTT WEBER, in his official capacity,

      Defendants.

_____

**ORDER**
_____

      This matter is before the Court on Defendant Lee Ingersoll's Motion to Dismiss

First Amended Complaint [Docket No. 44], Defendant City and County of Denver's

Motion to Dismiss First Amended Complaint [Docket No. 45], and Defendant Regional

Transportation District's Motion to Dismiss Plaintiffs' First Amended Complaint and Jury

Demand [Docket No. 47].  The Court has jurisdiction under 28 U.S.C. § 1331.

## I.     BACKGROUND[1]

      On June 2, 2019, Abade Irizarry and Kyle Shockley went to the public Wynkoop

Plaza in front of Union Station, a train station in downtown Denver, Colorado, to protest

_____

[1] The facts below are taken from plaintiffs' first amended complaint, Docket No. 37, and
are presumed to be true for purposes of ruling on defendants' motions to dismiss.  *See
Brown v. Montoya*, 662 F.3d 1152, 1162 (10th Cir. 2011).

police violence and the criminalization of the homeless population.  Docket No. 37 at 2-3, ¶ 9.  For twenty minutes, Mr. Irizarry and Mr. Shockley walked through Wynkoop Plaza decrying the urban camping ban and police treatment of homeless individuals.  *Id.* at 3, ¶¶ 11-15.  Plaintiffs chanted, "No justice, no peace.  Fuck the Police. . . and Fuck RTD too."  *Id.* at 4, ¶ 19.  Within minutes, private security guards hired by the Regional Transportation District ("RTD") began following plaintiffs and told them to stop protesting.  *Id.*, ¶¶ 20, 22.  Plaintiffs never threatened anyone or engaged in any violent behavior or property destruction during the protest.  *Id.* at 6, ¶ 32.  There were hundreds of people present in Wynkoop Plaza.  *Id.* at 7, ¶ 38.

Defendant Lee Ingersoll ("Sergeant Ingersoll"), a sergeant with the Denver Police Department, arrived at Union Station approximately twenty minutes into the protest.  *Id.* at 6, ¶¶ 33-35.  Sergeant Ingersoll spoke with an RTD security guard for approximately ten seconds and upon hearing Mr. Irizarry state, "Fuck the Police," asked the guard if this is what Mr. Irizarry had been doing.  *Id.*, ¶ 36.  Another RTD guard responded, "[Y]eah, he's walking through the fountain cussing."  *Id.*  The RTD guards also stated that plaintiffs were trespassing because of their vulgar comments.  *Id.*, ¶ 37.  Sergeant Ingersoll arrested plaintiffs for trespassing and disturbing the peace.  *Id.* at 7-8, ¶¶ 44-49.  Sergeant Ingersoll arrested plaintiffs solely based on hearing them say "Fuck the Police" and a comment from an RTD security guard that both plaintiffs had been "cussing."  *Id.* at 18, 20, ¶¶ 99-100, 121-122.  Sergeant Ingersoll never observed any violence or the use of fighting words.  *Id.* at 18, 20, ¶¶ 101, 123.  Sergeant Ingersoll stated that he was arresting plaintiffs because of the protests and the use of the word

"Fuck" was ruining everyone's day. *Id*. at 18, 20-21, ¶¶ 102, 124. Sergeant Ingersoll knew that plaintiffs were protesting on public sidewalks in a public plaza. *Id*. at 8, ¶ 52.

The RTD guards appear to have decided that plaintiffs were in violation of RTD's Wynkoop Plaza Rules, but the RTD guards did not communicate this information to Sergeant Ingersoll. *Id*. at 7, ¶¶ 39-42. The Wynkoop Plaza Rules state that "[a]ll activities on Wynkoop Plaza are subject to the following. . . restrictions [:] [n]o person shall engage in activity that is obscene, defamatory, or consists of fighting words or specific threats of serious bodily injury. No person shall incite imminent lawless action." *Id*., ¶ 40.

Two days later, on June 4, 2019, Mr. Irizarry returned to Wynkoop Plaza to protest the Denver Police violating his First Amendment right to protest. *Id*. at 10, ¶ 65. Almost immediately, four officers confronted Mr. Irizarry, yet Mr. Irizarry continued "calling out police killings" and the ways in which the police department silences people who speak out against police misconduct. *Id*., ¶ 66. Sergeant Ingersoll then arrested Mr. Irizarry for trespassing and disorderly conduct. *Id*., ¶¶ 67-68. A day later, Sergeant Ingersoll changed the charge to a felony for attempting to intimidate witnesses. *Id*., ¶ 69. Mr. Irizarry did not speak with any witnesses who were present at the previous protest. *Id*., ¶ 70. Sergeant Ingersoll did not speak with anyone on the scene and arrested Mr. Irizarry for returning to Union Station when Sergeant Ingersoll had already declared the previous protest unlawful. *Id*. at 19, ¶ 113.

Mr. Irizarry and Mr. Shockley assert eleven claims pursuant to 42 U.S.C. § 1983. *Id*. at 17-32. Both plaintiffs assert the following claims against Sergeant Ingersoll in his individual capacity and the City of Denver ("Denver") for the incident on June 2, 2019:

Fourth Amendment unlawful arrest (claims one and three); First Amendment free speech violation (claims four and six); and First Amendment retaliation (claims seven and nine). *Id*. at 17-30. Mr. Irizarry also asserts the following claims against Sergeant Ingersoll in his individual capacity and Denver for the incident on June 4, 2019: Fourth Amendment unlawful arrest (claim two); First Amendment free speech violation (claim five); and First Amendment retaliation (claim eight). *Id*. at 19-20, 23-24, 27-28. Mr. Irizarry and Mr. Shockley assert two claims against RTD challenging the Wynkoop Plaza Rules (claims ten and eleven). *Id*. at 30-32.[2]

Sergeant Ingersoll, Denver, and RTD filed motions to dismiss. Docket Nos. 44, 45, 47. Mr. Irizarry and Mr. Shockley responded to the motions. Docket Nos. 49, 50, 53. Sergeant Ingersoll, Denver, and RTD filed replies. Docket Nos. 55, 56, 59. On November 18, 2022, the defendants filed a joint supplement in support of their motions to dismiss, arguing that many of plaintiffs' claims are barred by *Heck v. Humphrey,* 512 U.S. 477 (1994). Docket No. 65.

## II.   LEGAL STANDARD

### A.  <u>Motion to Dismiss</u>

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint must allege enough factual matter that, taken as true, makes the plaintiff's "claim to relief . . . plausible on its face." *Khalik v. United Air Lines*, 671 F.3d 1188, 1190 (10th Cir. 2012) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

---

[2] In claims four through eleven, the amended complaint states that the plaintiffs' protests took place in 2020 and 2021. *See id*. at 21, 23-25, 27-28, 30-31, ¶¶ 132, 146, 160, 174, 186, 199, 211, 221. The Court presumes these are typographical errors since the rest of the amended complaint states that the events took place on June 2 and June 4, 2019. *See generally id*.

(2007)).  "The 'plausibility' standard requires that relief must plausibly follow from the facts alleged, not that the facts themselves be plausible." *RE/MAX, LLC v. Quicken Loans Inc.*, 295 F. Supp. 3d 1163, 1168 (D. Colo. 2018) (citing *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008)).  Generally, "[s]pecific facts are not necessary; the statement need only 'give the defendant fair notice of what the claim is and the grounds upon which it rests.'" *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam) (quoting *Twombly*, 550 U.S. at 555) (alterations omitted).  A court, however, does not need to accept conclusory allegations.  *See, e.g.*, *Hackford v. Babbit*, 14 F.3d 1457, 1465 (10th Cir. 1994) ("[W]e are not bound by conclusory allegations, unwarranted inferences, or legal conclusions.").

 "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not shown – that the pleader is entitled to relief."  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (quotations and alterations omitted); *see also Khalik*, 671 F.3d at 1190 ("A plaintiff must nudge [his] claims across the line from conceivable to plausible in order to survive a motion to dismiss." (quoting *Twombly*, 550 U.S. at 570)).  If a complaint's allegations are "so general that they encompass a wide swath of conduct, much of it innocent," then plaintiff has not stated a plausible claim.  *Khalik*, 671 F.3d at 1191 (quotations omitted).  Thus, even though modern rules of pleading are somewhat forgiving, "a complaint still must contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory."  *Bryson*, 534 F.3d at 1286 (alterations omitted).

### B. **Qualified Immunity**

"Qualified immunity balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).  A court should resolve questions of qualified immunity at the earliest possible stage of litigation. *Anderson v. Creighton*, 483 U.S. 635, 646 n.6 (1987).  However, a plaintiff facing a qualified immunity challenge still does not have a heightened pleading standard. *Currier v. Doran*, 242 F.3d 905, 916-17 (10th Cir. 2001).

Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Thus, to survive a motion to dismiss under Rule 12(b)(6) "where a qualified immunity defense is implicated, the plaintiff 'must allege facts sufficient to show (assuming they are true) that the defendants plausibly violated their constitutional rights.'" *Hale v. Duvall*, 268 F. Supp. 3d 1161, 1164 (D. Colo. 2017) (quoting *Robbins v. Oklahoma ex rel. Dep't of Human Servs.*, 519 F.3d 1242, 1249 (10th Cir. 2008)).  When a defendant raises the defense of qualified immunity, a "plaintiff carries a two-part burden to show: (1) that the defendant's actions violated a federal constitutional or statutory right, and, if so, (2) that the right was clearly established at the time of the defendant's unlawful conduct." *T.D. v. Patton*, 868 F.3d 1209, 1220 (10th Cir. 2017) (internal quotation marks omitted).  Courts are "permitted to exercise their sound

discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case." *Pearson*, 555 U.S. at 236.

### III.   ANALYSIS

#### A. <u>Documents Outside the Pleadings</u>

As an initial matter, defendants request that the Court consider several documents outside the pleadings in ruling on the motions to dismiss. *See* Docket No. 44 at 2-3; Docket No. 47 at 1-2 n.1.  Generally, a court should not consider any evidence beyond the pleadings when ruling on a 12(b)(6) motion, *Waller v. City & Cnty. of Denver*, 932 F.3d 1277, 1282 (10th Cir. 2019), and if the court considers matters outside the complaint, "the motion must be treated as one for summary judgment under Rule 56."  Fed. R. Civ. P. 12(d).  However, the Tenth Circuit has recognized a "limited exception" to this rule: the "district court may consider documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity."  *Waller*, 932 F.3d at 1282; *see also GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997) (recognizing that "if a plaintiff does not incorporate by reference or attach a document to its complaint, but the document is referred to in the complaint and is central to the plaintiff's claim, a defendant may submit an indisputably authentic copy to the court to be considered on a motion to dismiss").  However, a court has "broad discretion in determining whether or not to accept materials beyond the pleadings."  *Lowe v. Town of Fairland*, 143 F.3d 1378, 1381 (10th Cir. 1998).  When a court takes judicial notice of

documents, it may do so only to "show their contents, not to prove the truth of the matters asserted therein." *Tal v. Hogan*, 453 F.3d 1244, 1264 n.24 (10th Cir. 2006).

First, Sergeant Ingersoll requests that the Court take judicial notice of three probable cause statements related to plaintiffs' arrests on June 2 and June 4, 2019. Docket No. 44 at 2-3. Sergeant Ingersoll argues that these probable cause statements demonstrate that plaintiffs yelled "vulgarities towards hundreds of patrons on the plaza" and several citizens reported "feeling threatened by the behavior of Mr. Irizarry and Mr. Shockley." *Id.* at 4-5. The amended complaint does not reference the probable cause statements. *See generally* Docket No. 37. Accordingly, the Court will not consider the probable cause statements in ruling on the motions to dismiss. *See Waller*, 932 F.3d at 1282-83 (noting that Tenth Circuit precedent clearly states that the exception only applies to "documents referred to in the complaint").

Second, RTD asks the Court to take judicial notice of three orders from plaintiffs' criminal cases in Denver County Court, marked as Exhibits 1-3. Docket No. 47 at 1-2 n.1. In the orders, County Court Judge John W. Madden and County Court Judge Isabel Pallarés cite a cellphone video that Mr. Shockley made of his and Mr. Irizarry's actions on June 2, 2019. Docket No. 47-3 at 3; Docket No. 47-1 at 7. Judge Madden and Judge Pallarés each analyze Mr. Shockley's video and describe how Mr. Shockley and Mr. Irizarry repeatedly yelled numerous vulgarities at children and adults in the Wynkoop Plaza. Docket No. 47-3 at 3-11; Docket No. 47-1 at 7-12. RTD argues that these orders show that plaintiffs called children "bitches" and "assholes," and yelled vulgarities such as "fuck the kids," "fuck you," and "your parents are raising you to be assholes." Docket No. 47 at 2.

Plaintiffs respond that a court may only take judicial notice of another court's opinion for the existence of the opinion, not for the truth of the facts in the opinion. Docket No. 53 at 4 (citing *Estate of Lockett v. Fallin*, 841 F.3d 1098, 1111 (10th Cir. 2016)).  Plaintiffs contend that the Court should ignore the three court orders because RTD is introducing the orders for the truth of the facts, not for the existence of the opinions.  *Id*.  The Court agrees with plaintiffs and accordingly declines to take judicial notice of the facts found in the orders.  *See Fallin*, 841 F.3d at 1111. [3]

Finally, RTD requests that the Court consider the Wynkoop Plaza Rules, attached as Exhibit 4, because they are incorporated by reference in the plaintiffs' complaint and central to the claims against RTD.  Docket No. 47 at 1-2 n.2.  Plaintiffs contest the authenticity of Exhibit 4 because there is no indication of the document's date of adoption.  Docket No. 53 at 3.  RTD argues in reply that the "quibble with the date of adoption" is not relevant since the rules are also available online on RTD's website.  Docket No. 59 at 5 n.2.  The Court finds that the lack of a date does not call into question the authenticity of Exhibit 4.  The Court will consider Exhibit 4 because the Wynkoop Rules are referenced in the complaint, central to the plaintiffs' claims, and publicly available.  *See* Docket No. 37 at 7, 30-33, ¶¶ 39-41, 210-226; *see also GFF Corp*., 130 F.3d at 1384; *Waller*, 932 F.3d at 1282-83.

### B.  <u>Heck v. Humphrey Bar</u>

In *Heck*, the Supreme Court held that a plaintiff may not maintain a § 1983 claim for "harm caused by actions whose unlawfulness would render a conviction or

---

[3] The Court notes, however, that plaintiffs do not appear to dispute the accuracy of Judge Madden's and Judge Pallarés' descriptions of the statements and actions on Mr. Shockley's video.  *See* Docket No. 53 at 3-4.

sentence invalid" unless the plaintiff can show that the "conviction or sentence has

been reversed on direct appeal, expunged by executive order, declared invalid by a

state tribunal . . ., or called into question by a federal court's issuance of a writ of

habeas corpus." *Heck*, 512 U.S. at 486-87.  "Thus, when a state prisoner seeks

damages in a § 1983 suit, the district court must consider whether a judgment in favor

of the plaintiff would necessarily imply the invalidity of his conviction or sentence."  *Id*. at

487.  If it would, then the *Heck* bar applies and "the complaint must be dismissed unless

the plaintiff can demonstrate that the conviction or sentence has already been

invalidated."  *Id*.  If the plaintiff's claim will not demonstrate the invalidity of the

conviction, then the § 1983 action should proceed.  *Id*.

   Defendants argue that eight claims in the amended complaint are barred by

*Heck,* including claims one, three, four, six, seven, nine, ten, and eleven, because both

plaintiffs were convicted of Disturbing the Peace related to the incident on June 2, 2019.

Docket No. 65 at 1-2.[4]  On June 23, 2022, Mr. Shockley was convicted of Disturbing the

Peace in violation of Denver Revised Municipal Code § 38-89(a).  *Id*. at 1.  On October

13, 2022, Mr. Irizarry was also convicted of Disturbing the Peace.  *Id*.  The Disturbing

the Peace ordinance states:

> [i]t shall be unlawful for any person to disturb or tend to disturb the peace of
> another person or persons by violent, tumultuous, offensive or obstreperous
> conduct or by loud or unusual noises or by unseemly, profane, obscene or
> offensive language calculated to provoke a breach of the peace.

---

[4] Defendants do not assert a *Heck* bar for claims two, five, and eight because these
claims arise from Mr. Irizarry's arrest on June 4, 2019, and Mr. Irizarry has not been
convicted from the incident on June 4, 2019.  Docket No. 65 at 2 n.1.

Den. Rev. Mun. Code § 38-89(a).  The Court will consider whether a § 1983 judgment in favor of the plaintiffs on each claim would necessarily imply the invalidity of their convictions for disturbing the peace.

### 1.  Claims Four, Six, Seven and Nine - First Amendment Free Speech Violation and Retaliation

In claims four, six, seven, and nine, Mr. Irizarry and Mr. Shockley assert that they were prevented from exercising their First Amendment rights and were arrested in retaliation for engaging in protected speech on June 2, 2019.  Docket No. 37 at 21-22, 24-27, 28-30.  The Court finds that these four claims are barred by *Heck*.  To prevail on a First Amendment free speech or retaliation claim, a plaintiff must establish that his activities are protected by the First Amendment.  *Verlo v. Martinez*, 820 F.3d 1113, 1128 (10th Cir. 2016); *Becker v. Kroll*, 494 F.3d 904, 925 (10th Cir. 2007).  Mr. Irizarry and Mr. Shockley argue that they were engaged in protected speech by conducting protests on police brutality and Denver's treatment of the homeless.  Docket No. 37 at 21, 24-25, 28, ¶¶ 132, 160, 174, 199.  However, a judgment in favor of the plaintiffs on these claims would imply the invalidity of their convictions for Disturbing the Peace.  The Denver ordinance that plaintiffs were convicted under is the "fighting words" exception to the right to free speech.  *See Ware v. City & Cnty. of Denver*, 511 P.2d 475, 475-76 (Colo. 1973).  A § 1983 judgment in plaintiffs' favor would find that Mr. Irizarry and Mr. Shockley were engaged in constitutionally protected speech, which would invalidate their convictions for disturbing the peace.  Mr. Irizarry and Mr. Shockley have not demonstrated that their convictions have been overturned on appeal, expunged, or called into question by a writ of habeas corpus.  *See Heck*, 512 U.S. at 486-87.  As a result, claims four, six, seven, and nine are barred under *Heck*.

"[D]ismissals pursuant to *Heck* are without prejudice."  *Beck v. City of Muskogee Police Dep't*, 195 F.3d 553, 560 n.5 (10th Cir. 1999) (citing *Fottler v. United States*, 73 F.3d 1064, 1065-66 (10th Cir. 1996)).  As a result, claims four, six, seven, and nine are dismissed without prejudice with leave to refile if plaintiffs' criminal convictions are overturned.

### 2.   Claims One and Three - Fourth Amendment Unlawful Arrest

In claims one and three, Mr. Irizarry and Mr. Shockley assert unlawful arrest claims against Sergeant Ingersoll and Denver for their arrests on June 2, 2019.  Docket No. 37 at 17-19, 20-21.  Mr. Irizarry and Mr. Shockley argue that Sergeant Ingersoll arrested them for "protesting homelessness and for saying the phrase 'Fuck the Police,'" yet Sergeant Ingersoll never witnessed any violence or heard them use fighting words.  *Id*. at 18, 20, ¶¶ 99, 101, 121, 123.  Plaintiffs argue that Sergeant Ingersoll had no probable cause for the arrests.  Docket No. 49 at 6.

The Tenth Circuit has held that *Heck* does not universally bar Fourth Amendment unlawful arrest claims.  *See Laurino v. Tate*, 220 F.3d 1213, 1217 (10th Cir. 2000) ("[A] suspect's proof that police lacked probable cause to arrest him does not necessarily imply the invalidity or unlawfulness of his conviction for the underlying offense."); *Bryner v. Utah*, 429 F. App'x 739, 744 (10th Cir. 2011) (unpublished) ("In most cases. . . in order to prevail on a Fourth Amendment improper seizure claim by showing a lack of probable cause, a previously-convicted plaintiff does not necessarily have to negate an element of the crime for which he was convicted."); *Beck*, 195 F.3d at 559; *see also Sexton v. Hickenlooper*, No. 13-cv-01008-MSK-KMT, 2014 WL 1091936, at *4 (D. Colo. Mar. 19, 2014) (discussing how a plaintiff is barred under *Heck* from

claiming he did not commit the underlying offense that he was arrested for, but is not always barred from arguing that the officer lacked probable cause for the arrest).

Defendants argue that a judgment in plaintiffs' favor would imply the invalidity of their convictions for Disturbing the Peace because it would conclude there was no probable cause to arrest plaintiffs on June 2, 2019.  Docket No. 65 at 3.  In support of their argument, defendants cite *Talmadge v. Marner*, No. 21-cv-01829-STV, 2022 WL 1591600, at *4 (D. Colo. May 19, 2022), where the court found that *Heck* barred a plaintiff's Fourth Amendment unlawful arrest claim.  *Id*.  However, the Court finds that *Talmadge* is distinguishable because the plaintiff in that case was arrested for resisting arrest.  *See Talmadge,* 2022 WL 1591600, at *4.  A plaintiff convicted of resisting arrest, which is defined as "intentionally preventing a peace officer from effecting a *lawful arrest*," is barred from bringing a § 1983 claim for unlawful arrest because such a claim negates an element of the underlying offense, the lawfulness of the arrest.  *See Sexton*, 2014 WL 1091936, at *4 (emphasis in original).  Mr. Irizarry and Mr. Shockley's allegation that Sergeant Ingersoll lacked probable cause for the arrests would not be barred under *Heck* because a finding that Sergeant Ingersoll lacked probable cause would not negate an element of the disturbing the peace convictions.  *See id.* (holding that plaintiff's allegation that the officers lacked probable cause to arrest him for disturbing the peace did not call into doubt his conviction for disturbing the peace).  As a result, claims one and three are not barred under *Heck*.

### 3.  Claims Ten and Eleven – Facial Challenges

In claims ten and eleven, plaintiffs challenge the constitutionality of RTD's Wynkoop Plaza Rules.  Docket No. 37 at 30-32.  Defendants cursorily state that claims

ten and eleven should be dismissed under *Heck*, but provide no legal argument for dismissal.  *See* Docket No. 65 at 2.  Plaintiffs were convicted of Disturbing the Peace under Den. Rev. Mun. Code § 38-89(a).  *Id*. at 1.  A finding that the RTD Wynkoop Plaza Rules are unconstitutional would not imply the invalidity of the convictions for Disturbing the Peace under the Denver Code.  Consequently, claims ten and eleven are not barred under *Heck*.

### C.  **Claims against Sergeant Ingersoll**

Mr. Irizarry and Mr. Shockley bring nine claims against Sergeant Ingersoll in his individual capacity, including three unlawful arrest, three First Amendment free speech, and three First Amendment retaliation claims.  Docket No. 37 at 17-30.  The Court previously dismissed claims four, six, seven, and nine without prejudice under *Heck*. Sergeant Ingersoll asserts qualified immunity on all claims.  Docket No. 44 at 2.

#### *1.  Claims One & Three - Unlawful Arrests on June 2, 2019*

The Fourth Amendment provides the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."  U.S. Const. Amend. IV.  A "seizure" of one's person occurs when a government actor terminates one's freedom of movement through intentional means.  *See Brower v. Cnty. of Inyo*, 489 U.S. 593, 596–97 (1989); *Scott v. Harris*, 550 U.S. 372, 381 (2007).  An arrest requires probable cause to believe that the arrestee committed a crime.  *Fogarty v. Gallegos*, 523 F.3d 1147, 1156 (10th Cir. 2008).

"In a qualified immunity context, the probable cause evaluation is a question of law appropriate for resolution by the Court."  *Shimomura v. Carlson*, 17 F. Supp. 3d 1120, 1132 (D. Colo. 2014) (citing *Hunter v. Bryant*, 502 U.S. 224, 228 (1991)).  In

determining whether an officer has probable cause for an arrest, the court must "examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause." *District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018) (internal quotations marks and citation omitted). "Probable cause exists if facts and circumstances within the arresting officer's knowledge and of which he or she has reasonably trustworthy information are sufficient to lead a prudent person to believe that the arrestee has committed or is committing an offense." *York v. City of Las Cruces*, 523 F.3d 1205, 1210 (10th Cir. 2008) (quoting *Romero v. Fay*, 45 F.3d 1472, 1476 (10th Cir. 1995)). Probable cause is not a high bar. *Wesby*, 138 S. Ct. at 586.

"[W]hen a warrantless arrest or seizure is the subject of a § 1983 action, the defendant is entitled to qualified immunity if a reasonable officer could have believed that probable cause existed to arrest or detain the plaintiff." *Cortez v. McCauley*, 478 F.3d 1108, 1120 (10th Cir. 2007) (en banc). Thus, in the Tenth Circuit, "[a]s a practical matter, in the context of a qualified immunity defense on an unlawful arrest claim, [courts] ascertain whether a defendant violated clearly established law by asking whether there was arguable probable cause for the challenged conduct." *Corona v. Aguilar*, 959 F.3d 1278, 1285 (10th Cir. 2020) (internal quotation marks and alterations omitted). "Arguable probable cause" is another way of saying that the officers' conclusions about whether probable cause existed rested on a reasonable but mistaken belief. *Cortez*, 478 F.3d at 1120-21. Therefore, Sergeant Ingersoll is entitled to qualified immunity if he "could have reasonably believed that probable cause existed in

light of well-established law." *Felders ex rel. Smedley v. Malcom*, 755 F.3d 870, 879 (10th Cir. 2014) (citation omitted).

Sergeant Ingersoll argues that he had probable cause or arguable probable cause to arrest plaintiffs on June 2, 2019 for Disturbing the Peace under Den. Rev. Mun. Code § 38-89 and trespass under Den. Rev. Mun. Code § 38-115,[5] citing the probable cause statements that the Court has refused to consider at this stage. *See* Docket No. 44 at 9-10.  Plaintiffs argue there was no probable cause or arguable probable cause to arrest them because they were engaged in constitutionally protected speech in a public forum.  Docket No. 49 at 6.  Plaintiffs argue that it is well-established that a government official may not base a probable cause determination on speech protected by the First Amendment. *Id*. (citing *Mink v. Knox*, 613 F.3d 995, 1003-04 (10th Cir. 2010)).

The complaint states that Mr. Irizarry and Mr. Shockley were protesting at the Wynkoop Plaza, a public forum, about police violence and the criminalization of the homeless population.  Docket No. 37 at 2-3, ¶¶ 9-10.  Sergeant Ingersoll arrested Mr. Irizarry and Mr. Shockley for disturbing the peace and trespass. *Id*. at 8, ¶ 49. Sergeant Ingersoll arrested plaintiffs solely based on hearing them say "Fuck the Police" and a comment from an RTD security guard that both plaintiffs had been "cussing." *Id*. at 18, 20, ¶¶ 99-100, 121-122.  Sergeant Ingersoll never observed any violence or the use of fighting words. *Id*. at 18, 20, ¶¶ 101, 123.  Sergeant Ingersoll stated that he was

---

[5] The trespass ordinance states that it is "unlawful for any person knowingly to enter or remain upon the premises of another when consent to enter or remain is absent, denied, or withdrawn by the owner, occupant, or person having lawful control thereof." Den. Rev. Mun. Code § 38-115(a).

arresting plaintiffs because of the protests and the use of the word "Fuck" was ruining everyone's day. *Id.* at 18, 20-21, ¶¶ 102, 124. Sergeant Ingersoll knew that plaintiffs were protesting on public sidewalks in a public plaza. *Id.* at 8, ¶ 52. The Court finds that plaintiffs have pled sufficient facts to show that a reasonable officer in Sergeant Ingersoll's position would not have found these facts, as alleged in the complaint, sufficient to establish probable cause, or arguable probable cause, to arrest plaintiffs for disturbing the peace or trespassing.[6] Plaintiffs have therefore plausibly established a constitutional violation for the arrests on June 2, 2019.

The Court next considers whether the right was clearly established at the time of the incident. Plaintiffs argue that it was clearly established that saying "Fuck the Police" could not form the basis for an arrest because the mere use of profanity is protected by the First Amendment and it is clearly established that First Amendment activity cannot form the basis for probable cause. Docket No. 49 at 10 (citing *Mink*, 613 F.3d at 1003-04; *Lewis v. City of New Orleans*, 415 U.S. 130, 132 (1974)). Sergeant Ingersoll argues that these cases only speak at a high level of generality about individuals using profanity and fail to show that plaintiffs' specific conduct is protected by clearly

---

[6] The Court has declined at this stage to consider the probable cause statements and the facts in the Denver County orders. However, the Court notes that Judge Pallarés and Judge Madden carefully recounted the facts from Mr. Shockley's video. *See* Docket No. 47-3 at 3-11; Docket No. 47-1 at 7-12. Both judges found that the plaintiffs' speech constituted fighting words and supported a charge for disturbing the peace. *See* Docket No. 47-3 at 11-15 (stating that although Mr. Irizarry "occasionally make[s] statements related to homelessness and make[s] complaints about the police, he also repeatedly directs slurs and inflammatory comments at individuals in a way that appears to be an effort to provoke and incite them personally. . . [m]ultiple times individuals began to challenge and confront [Mr. Irizarry]."); Docket No. 47-1 at 17 (stating that Mr. Shockley's speech "tended to incite an immediate breach of the peace by among other things, yelling at citizens loudly with abusive and disparaging remarks. There was evidence that [Mr. Shockley's] comments provoked citizens into a physical response.").

17

established law.  Docket No. 55 at 4.  At the time of this incident, it was clearly

established under *Mink* that "a government official may not base her probable cause

determination on an 'unjustifiable standard,' such as speech protected by the First

Amendment."  *Mink*, 613 F.3d at 1003-04 (citation omitted).  The law was also clearly

established that the First Amendment protects a "significant amount of verbal criticism

and challenge directed at police officers" unless the speech constitutes "fighting words."

*City of Houston v. Hill*, 482 U.S. 451, 461 (1987); *see also Cohen v. California*, 403 U.S.

15, 16, 26 (1971) (holding that the words "fuck the draft" are entitled to First Amendment

protection); *United States v. McKinney*, 9 F. App'x 887, 888-89 (10th Cir. 2001)

(unpublished) (holding that a statement telling a police officer to "go fuck himself" was

protected speech).  According, the Court finds that it was clearly established that saying

"fuck the police" during a protest without any accompanying violence could not form the

probable cause necessary for an arrest.  Therefore, Sergeant Ingersoll is not entitled to

qualified immunity at this stage of the proceedings and the Court will deny the motion to

dismiss claims one and three against Sergeant Ingersoll in his individual capacity.

### 2.  Claim Two - Unlawful Arrest on June 4, 2019

Mr. Irizarry also asserts an unlawful arrest claim for June 4, 2019.  Docket No.

37 at 19-20.  Sergeant Ingersoll contends that he had arguable probable cause to arrest

Mr. Irizarry for disturbing the peace under Den. Rev. Mun. Code § 38-89 and

intimidation of a witness under Colo. Rev. Stat. § 18-8-704,[7] citing the probable cause

statements that the Court has refused to consider at this stage.  *See* Docket No. 44 at

---

[7] A person commits intimidation of a witness under Colo. Rev. Stat. § 18-8-704 if he
threatens, harasses, or harms a witness in a criminal proceeding with the requisite
intent.  *See* Colo. Rev. Stat. § 18-8-704.

8, 10.  Mr. Irizarry argues that Sergeant Ingersoll lacked probable cause for the arrest because he arrested him simply in retaliation for his protest activity.  Docket No. 49 at 9.

The complaint states that Mr. Irizarry returned to the Wynkoop Plaza on June 4, 2019 to protest the Denver Police violating his First Amendment right to protest and to denounce "police killings."  Docket No. 37 at 10, ¶¶ 65-66.  Almost immediately, Sergeant Ingersoll arrested Mr. Irizarry.  *Id*., ¶¶ 66-67.  The complaint states that "Mr. Irizarry had spoken with no witnesses who had been present at the previous protest" and his protest was never threatening.  *Id*., ¶¶ 70-71.  Sergeant Ingersoll did not speak with anyone and arrested Mr. Irizarry simply because he was protesting the Denver Police and because he returned to Union Station when Sergeant Ingersoll had already declared the previous protest unlawful.  *Id*. at 19, ¶¶ 111, 113.  The Court finds that Mr. Irizarry has pled sufficient facts to show that a reasonable officer in Sergeant Ingersoll's position would not have found these facts sufficient to establish probable cause, or arguable probable cause, to arrest him for disturbing the peace or intimidation of a witness.  Mr. Irizarry has therefore plausibly established a constitutional violation for his arrest on June 4, 2019.

The law was clearly established at the time of this incident that engaging in First Amendment activity cannot form the basis for probable cause for an arrest.  *Mink*, 613 F.3d at 1003-04.  Therefore, Sergeant Ingersoll is not entitled to qualified immunity at this stage and the Court will deny his motion to dismiss claim two.

### 3.  Claim Eight - First Amendment Retaliation on June 4, 2019

Mr. Irizarry asserts a claim against Sergeant Ingersoll in his individual capacity for First Amendment retaliation on June 4, 2019.  Docket No. 37 at 27-28.  Generally,

"the First Amendment prohibits government officials from subjecting an individual to retaliatory actions for engaging in protected speech." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019) (internal quotation marks omitted).  To establish a First Amendment retaliation claim, a plaintiff must demonstrate (1) that he was engaged in a constitutionally protected activity; (2) that the defendant's action caused him to suffer an injury that would "chill a person of ordinary firmness from continuing to engage in that activity"; and (3) that the defendant's action was "substantially motivated" in response to his exercise of First Amendment speech rights. *Becker v. Kroll*, 494 F.3d 904, 925 (10th Cir. 2007).  Ordinarily, a plaintiff must also plead the absence of probable cause for the arrest.  *Id*.

Sergeant Ingersoll argues that Mr. Irizarry's allegations fail to establish that the arrest was substantially motivated in response to Mr. Irizarry's exercise of constitutionally protected speech or that the arrest was made without probable cause. Docket No. 44 at 13.  Mr. Irizarry argues that he has sufficiently pled the third element because the close temporal proximity between Mr. Irizarry's protected speech and the arrest gives rise to a strong inference that Sergeant Ingersoll was "substantially motivated" to arrest Mr. Irizarry due to his speech.  Docket No. 49 at 14 (citing *Sexton v. City of Colorado Springs*, 530 F. Supp. 3d 1044, 1067 (D. Colo. Mar. 31, 2021)).  The complaint states that Sergeant Ingersoll arrested Mr. Irizarry "[a]lmost immediately" after he began protesting about the Denver Police violating his First Amendment right to protest.  Docket No. 37 at 10, ¶¶ 65-67.  The Court already found that Mr. Irizarry's arrest on June 4, 2019 was not supported by probable cause or arguable probable cause.  The Court finds that the close temporal proximity between the protected speech

and the arrest, combined with the absence of probable cause, is sufficient to plead that a retaliatory motive was the "but-for" cause of Mr. Irizarry's arrest. *See Esparza v. Bowman*, 523 F. App'x 530, 536 (10th Cir. 2013) (unpublished) (upholding district court determination that close temporal proximity between protected speech and arrest, coupled with the absence of probable cause, "supported a strong inference" that defendant was motivated by plaintiff's speech). Mr. Irizarry has therefore adequately pled each element of a First Amendment retaliation claim.

The law was also clearly established in June 2019 that "the First Amendment prohibits government officials from subjecting an individual to retaliatory actions for engaging in protected speech," including arrests without probable cause. *Nieves*, 139 S. Ct. at 1722, 1725. As a result, Sergeant Ingersoll is not entitled to qualified immunity and the Court will deny Sergeant Ingersoll's motion regarding claim eight.

### 4. Claim Five - First Amendment Violation on June 4, 2019

Mr. Irizarry also asserts a separate claim against Sergeant Ingersoll in his individual capacity for a free speech violation on June 4, 2019. Docket No. 37 at 23. Mr. Irizarry alleges that Sergeant Ingersoll's arrest and citation of Mr. Irizarry was a content-based and viewpoint-based restriction on speech. *Id*. at 23, ¶ 148. Mr. Irizarry alleges that the arrest prevented him from speaking out on a matter of public concern and chilled him from exercising his First Amendment rights. *Id*., ¶¶ 150-51. Sergeant Ingersoll argues that Mr. Irizarry fails to state a claim distinct from his retaliation claim given that Mr. Irizarry has not identified a prior restraint or alleged that the arrest has prevented him from engaging in subsequent First Amendment activities. Docket No. 44 at 12. Mr. Irizarry argues that he has pled a legal theory distinct from the retaliation

claim because he has brought an "as applied" First Amendment claim.  Docket No. 49 at 10-11.  Mr. Irizarry cites *Sexton* where the Court found the plaintiff had pled a First Amendment claim distinct from his retaliation claim because he pled that the arrest was a content-based restriction on speech.  *Sexton*, 530 F. Supp. 3d at 1065.

Sergeant Ingersoll's argument that claim five should be dismissed is based entirely on the notion that claim five is duplicative of claim eight.  *See* Docket No. 44 at 12.  However, because an arrest can give rise to a content-based restriction on free speech, Mr. Irizarry has pled a distinct basis for claim five.  *See Sexton*, 530 F. Supp. 3d at 1065 (holding that "an arrest by a police officer can give rise to a claim for content-based restriction on free speech").  Therefore, the Court will deny the motion to dismiss claim five against Sergeant Ingersoll in his individual capacity.

### D.  <u>Claims against Denver</u>

Mr. Irizarry and Mr. Shockley bring nine claims against Denver, including three Fourth Amendment unlawful arrest, three First Amendment free speech, and three First Amendment retaliation claims.  Docket No. 37 at 17-30.  Denver moves to dismiss the municipal liability claims for failure to state a claim.  Docket No. 45 at 2.  The Court previously dismissed claims four, six, seven, and nine without prejudice under *Heck*.

Local governments may not be sued under 42 U.S.C. § 1983 on a theory of *respondeat superior*.  *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 692 (1978). Instead, local governing bodies can be sued directly only where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers."  *Id*. at 690 (footnote omitted).  "[I]t is when execution of a government's policy or custom,

whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."  *Id.* at 694.

In order to state a claim for municipal liability under § 1983 for the actions of a municipal employee, a party must allege sufficient facts to demonstrate that it is plausible (1) that the municipal employee committed a constitutional violation; and (2) that a municipal policy or custom was the moving force behind the constitutional deprivation.  *Jiron v. City of Lakewood*, 392 F.3d 410, 419 (10th Cir. 2004).  A municipal policy or custom can take the form of

> (1) a formal regulation or policy statement; (2) an informal custom amoun[ting] to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions – and the basis for them – of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from 'deliberate indifference' to the injuries that may be caused.

*Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010) (citations omitted).

A plaintiff must also demonstrate "a direct causal link between the policy or custom and the injury alleged."  *Id.* (internal quotation marks omitted).  "Where a plaintiff claims that the municipality has not directly inflicted an injury, but nonetheless has caused an employee to do so, rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee."  *Bryan Cnty. Bd. of Comm'rs v. Brown*, 520 U.S. 397, 405 (1997).  "The causation element is applied with especial rigor when the municipal policy or practice is itself not unconstitutional, for example, when the municipal liability claim is based upon

inadequate training, supervision, and deficiencies in hiring."  *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 770 (10th Cir. 2013) (internal quotation marks omitted).

### 1.  Constitutional Violation

To maintain a municipal liability claim, a plaintiff must first show that a municipal employee violated the plaintiff's constitutional rights.  *See Jiron*, 392 F.3d at 419.  The Court previously found that plaintiffs adequately pled constitutional violations against Sergeant Ingersoll for unlawful arrest, First Amendment free speech, and First Amendment retaliation.  The first element of the municipal liability claim has therefore been met.

### 2.  Municipal Policy or Custom

Mr. Irizarry and Mr. Shockley argue that they can establish a policy of First and Fourth Amendment violations because 1) Denver has a widespread practice of targeting protesters in violation of the First and Fourth Amendments; and 2) Denver has a failed to adequately train its police officers regarding the protections of the First Amendment. Docket No. 50 at 7-11.[8]

### a.  Custom Amounting to Widespread Practice

Municipalities may "incur liability when they adopt unconstitutional 'longstanding practice[s] or custom[s]' that become 'standard operating procedure[s].'"  *Murphy v. City of Tulsa*, 950 F.3d 641, 649 (10th Cir. 2019) (quoting *Jett v. Dallas Indep. Sch. Dist.*,

---

[8] Plaintiffs briefly mention ratification in their amended complaint, *see* Docket No. 37 at 17, ¶ 95; however, plaintiffs state in their response that they will "not contest ratification at this time."  Docket No. 50 at 10.  Accordingly, the Court will not evaluate a ratification theory.

491 U.S. 701, 737 (1989)).  "In attempting to prove the existence of such a continuing, persistent and widespread custom, plaintiffs most commonly offer evidence suggesting that similarly situated individuals were mistreated by the municipality in a similar way."  *Carney v. City & Cnty. of Denver*, 534 F.3d 1269, 1274 (10th Cir. 2008).

Mr. Irizarry and Mr. Shockley argue that the amended complaint outlines numerous examples where Denver has violated protestors' free speech rights and Fourth Amendment rights.  Docket No. 50 at 3-4, 7-9.  However, the Court finds that most of these alleged incidents have no similarity to the facts of this case.  Two of the allegations involve the Denver Police historically maintaining secret spy files on more than 3,200 protestors and monitoring the social media accounts of activists.  Docket No. 37 at 11, ¶¶ 76-77.  Three incidents involve mass arrests of protestors or excessive force against protestors during the Democratic National Convention in 2009, the Occupy movement in 2011, and the George Floyd protests in 2020.  *Id.* at 11-12, 15-16, ¶¶ 78-79, 87-88.  Two of the incidents involve the right of bystanders to photograph or record alleged police misconduct.  *Id.* at 12-13, ¶¶ 81, 83.  Another allegation involves plaintiffs who were arrested for passing out fliers regarding jury nullification in front of a courthouse.  *Id.* at 13, ¶ 82.  One allegation states, "DPD officers have also repeatedly used unlawful, excessive force against journalists in violation of the First Amendment."  *Id.* at 16, ¶ 89.  Plaintiffs' allegations regarding their own arrests do not involve monitoring by the police, a mass protest, excessive force, recording the police, educating people about juror nullification, or violence against journalists.  *See generally id*.

Plaintiffs have alleged four incidents that are more akin to the facts of this case. In September 2013, Bruce Baumann was arrested by a Denver police officer after asking a question to United States Senator Joseph Lieberman during a public event and was arrested due to the content of the question. *Id*. at 12, ¶ 80. Similarly, plaintiffs allege that Caryn Sodaro was arrested on September 23, 2018 for alleged trespassing while handling out meals to the homeless and protesting on a public sidewalk on the Sixteenth Street Mall. *Id*. at 14, ¶ 84. On September 24, 2018, Eric Brandt went to the Sixteenth Street Mall to protest the arrests of Ms. Sodaro and others, and shouted "Caryn Sodaro is a political prisoner for free speech!" *Id*. at 14-15, ¶ 86. Mr. Brandt was arrested for disturbing the peace after a bystander signed a complaint; the bystander signed the complaint after an officer loudly stated, "unfortunately we can't be offended, but if a private citizen is willing to sign a complaint, I'd be happy to arrest him." *Id*. However, these incidents do not allege that the officers arrested Mr. Baumann, Ms. Sodaro, or Mr. Brandt because they criticized the police and therefore are dissimilar from the facts of this case.

One of the incidents, however, is sufficiently similar for the Court to consider it when determining whether plaintiffs have pled the existence of a municipal policy. On September 23, 2018, after Ms. Sodaro was arrested on the Sixteenth Street Mall, Brian Loma decried the treatment of homeless people and shouted "fuck the police!" *Id*., ¶ 85. Mr. Loma was immediately arrested for disturbing the peace. *Id*. This incident is sufficiently similar to the facts of this case because it involves an arrest allegedly due to the arrestee criticizing the police. *See Sexton*, 530 F. Supp. 3d at 1070.

The Court must determine whether one prior incident is sufficient to show "an informal custom amoun[ting] to a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law." *Bryson*, 627 F.3d at 788.  The Court finds that one alleged incident, occurring nearly a year prior to the allegations in this complaint, is insufficient to show a practice so permanent and well settled that it constitutes a custom or usage with the force of law.  *See Sexton*, 530 F. Supp. 3d at 1071 (holding that two incidents of retaliatory arrest were insufficient to establish a widespread practice); *Hernandez v. City & Cnty. of Denver*, No. 21-cv-01538-PAB-MEH, 2022 WL 3597452, at *6 (D. Colo. Aug. 23, 2022) (holding that four incidents of excessive force were insufficient to establish an informal custom); *Lankford v. City of Hobart*, 73 F.3d 283, 287 (10th Cir. 1996) (noting that "isolated and sporadic acts" do not establish municipal liability for § 1983); *Waller v. City & Cnty. of Denver*, 932 F.3d 1277, 1290 (10th Cir. 2019) ("[D]escribing only one similar incident of excessive force prior to his own injuries—fall[s] far short of plausibly alleging a 'widespread practice' of excessive force, much less a practice 'so permanent and well settled as to constitute a custom or usage with the force of law.'" (quoting *Bryson*, 627 F.3d at 788)).[9]  Therefore, Mr. Irizarry and Mr. Shockley have not pled a policy of First or Fourth Amendment violations pursuant to an informal custom.

---

[9] The Tenth Circuit has held that "a single incident may suffice when caused by an existing policy that 'can be attributed to a municipal policymaker.'"  *Murphy v. City of Tulsa*, 950 F.3d 641, 649 (10th Cir. 2019).  However, plaintiffs have not alleged the existence of a policy, regarding arresting individuals who criticize the police, that is attributable to a municipal policymaker.  *See generally* Docket No. 37.

### b.  Failure to Train

To state a *Monell* claim based on the failure to train or supervise, "a plaintiff must sufficiently allege that the failure 'amounts to deliberate indifference to the rights of persons with whom the police come into contact.'"  *Rehberg v. City of Pueblo*, No. 10-cv-00261-LTB-KLM, 2012 WL 1326575, at *4 (D. Colo. Apr. 17, 2012) (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)).  However, "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011); *see also Okla. City v. Tuttle*, 471 U.S. 808, 822–823 (1985) (plurality opinion) (discussing how a policy of inadequate training is "far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in *Monell*").

"Deliberate indifference" is an exacting standard of fault.  *See Bryan Cnty.*, 520 U.S. at 410.  It requires showing that a municipal actor disregarded a known or obvious consequence of his action.  *Id.*  "Thus, when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program."  *Connick*, 563 U.S. at 61. "Deliberate indifference" for purposes of failure-to-train ordinarily necessitates a showing of a pattern of similar constitutional violations by untrained employees.  *See Bryan Cnty.*, 520 U.S. at 409.  Therefore, to proceed on a failure-to-train theory, plaintiff must prove "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need."  *Jenkins v.*

*Wood*, 81 F.3d 988, 994 (10th Cir. 1996) (quoting *Canton*, 489 U.S. at 390).  Notice of

particular deficiencies in a training program is the crux of a failure-to-train theory

because, "[w]ithout notice that a course of training is deficient in a particular respect,

decisionmakers can hardly be said to have deliberately chosen a training program that

will cause violations of constitutional rights."  *Connick*, 563 U.S. at 62.

Plaintiffs argue that Denver is liable because it "failed to provide additional or

better training and supervision to DPD officers regarding the protections of the First

Amendment" despite knowledge of constitutional violations.  Docket No. 37 at 17, ¶ 93.

However, these conclusory arguments lack any supporting facts providing a basis for

the failure-to-train theory.  Mr. Irizarry and Mr. Shockley do not set forth any facts

concerning how Sergeant Ingersoll was trained, who trained him, why his training was

deficient, or how the incident could have been avoided with different training.  *See, e.g.*,

*Sexton*, 530 F. Supp. 3d at 1072 (finding the plaintiff's failure-to-train allegations

insufficient where the plaintiff did not state how the officers were trained and who

trained them); *Cook v. Whyde*, No. 20-cv-02912-PAB-STV, 2021 WL 4459051, at *16

(D. Colo. Sept. 29, 2021) (dismissing *Monell* claim for failure to allege specific facts

concerning how the defendants were trained or why the training was deficient); *Est. of*

*Lobato by & through Montoya v. Correct Care Sols., LLC*, No. 15-cv-02718-PAB-STV,

2017 WL 1197295, at *7 (D. Colo. Mar. 31, 2017) ("Notice of particular deficiencies in a

training program is the crux of a failure-to-train theory."); *Bark v. Chacon*, No. 10-cv-

01570-WYD-MJW, 2011 WL 1884691, at *3 (D. Colo. May 18, 2011) (dismissing

municipal liability claim where plaintiff had "generally allege[d]" that the individual

defendants were not properly trained but had not "allege[d] specific deficiencies in

training and supervision, or explain[ed] how the incident described in the Amended Complaint could have been avoided with different or better training and supervision"). This alone is fatal to Mr. Irizarry and Mr. Shockley's failure-to-train claim.

The plaintiffs argue that the Court can infer a policy of inadequate training based on Sergeant Ingersoll's belief that it was legal to arrest plaintiffs for using profane language to criticize the police. Docket No. 50 at 10-11. However, a plaintiff may not attempt to fasten liability onto a city solely because "a particular officer may be unsatisfactorily trained" because "the officer's shortcomings may have resulted from factors other than a faulty training program." *Canton*, 489 U.S. at 390-91. The Court therefore rejects this argument.

Because Mr. Irizarry and Mr. Shockley have not plausibly alleged an official policy or a custom, the Court will dismiss their claims against Denver without considering the causation or state-of-mind elements of municipal liability. *See Schneider*, 717 F.3d at 769; *see also Whyde*, 2021 WL 4459051, at *16 (dismissing *Monell* claim without considering causation or deliberate indifference because the plaintiff failed to plausibly allege an official policy or custom). The Court will therefore grant the City's motion to dismiss the municipal liability claims. Claims one, two, three, five, and eight are dismissed with prejudice against Denver.

### E. Claims against RTD

Plaintiffs assert two claims against RTD, both facial challenges to the Wynkoop Plaza Rules. Docket No. 37 at 30-32; Docket No. 53 at 6. Claim ten asserts that the Wynkoop Plaza Rules are unconstitutionally vague and overbroad in violation of the First and Fifth Amendments. Docket No. 37 at 30. Claim eleven argues that the

Wynkoop Plaza Rules are facially unconstitutional under the First Amendment because the rules "punish expression as an obscenity without more specificity."  *Id*. at 31.  The Wynkoop Plaza Rules state that

> [n]o person shall engage in activity that is obscene, defamatory, or consists of fighting words or specific threats of serious bodily injury.  No person shall incite imminent lawless action.

Docket No. 47-4 at 3; *see also* Docket No. 37 at 7, ¶ 40.

RTD moves to dismiss both claims under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim and moves to dismiss any claim for punitive damages.  Docket No. 47 at 5, 15.

### 1.  Punitive Damages

RTD moves to dismiss any claim for punitive damages because punitive damages are not recoverable against the entity.  Docket No. 47 at 15.  Plaintiffs do not respond to this argument.  *See generally* Docket No. 53.  A municipality is immune from punitive damages in a § 1983 suit.  *Miller v. City of Mission*, 705 F.2d 368, 377 (10th Cir. 1983) (citing *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981)).  Accordingly, the Court grants this portion of the motion and dismisses any claim for punitive damages against RTD.

### 2.  Claims Ten and Eleven – Facial Challenges

As a preliminary matter, the Court questions whether plaintiffs have standing to challenge the constitutionality of RTD's Wynkoop Plaza Rules.  To establish Article III standing, a plaintiff must allege 1) that he suffered an "injury in fact;" 2) that there is a casual connection between the injury and the challenged conduct; and 3) that it is likely, not speculative, that the injury will be redressed by a favorable decision.  *Nat. Council*

*for Improved Health v. Shalala*, 122 F.3d 878, 881 (10th Cir. 1997) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).  Additionally, prudential standing requirements impose other limits on the exercise of federal jurisdiction.  *Wilderness Soc. v. Kane Cnty., Utah*, 632 F.3d 1162, 1168 (10th Cir. 2011).  Although courts have lessened the prudential limitations on standing within the First Amendment context, a plaintiff asserting a First Amendment facial challenge to a statute must still establish the "bedrock Article III standing requirements of injury-in-fact, causation, and redressability." *Winsness v. Yocom*, 433 F.3d 727, 734 (10th Cir. 2006); *see also D.L.S. v. Utah*, 374 F.3d 971, 976 (10th Cir. 2004); *Shalala*, 122 F.3d at 882.

Plaintiffs argue they have standing to assert claims ten and eleven because plaintiffs allege "they were arrested in part for [t]respassing at Union Station and that the basis for such citation was that RTD security guards determined that their speech was obscene and therefore in violation of the Wynkoop Plaza Rules."  Docket No. 53 at 6-7.  However, the Court has concerns in light of the apparent content of Mr. Shockley's video as to whether there is a causal connection between plaintiffs' arrests and the Wynkoop Plaza Rules and, consequently, whether the plaintiffs have standing to challenge the constitutionality of the Rules.  As a result, the Court will deny the motion to dismiss and will address the First Amendment facial challenges on a more developed factual record.

Accordingly, the portion of RTD's motion requesting dismissal of claims ten and eleven is denied.

## IV.      CONCLUSION

It is therefore

ORDERED that Defendant's Supplement in Support of their Motions to Dismiss Plaintiffs' Amended Complaint and Jury Demand [Docket No. 65] is **GRANTED IN PART** and **DENIED IN PART**.  It is further

ORDERED that claims four, six, seven, and nine are **dismissed without prejudice** against Sergeant Ingersoll in his individual capacity pursuant to *Heck*.  It is further

ORDERED that claims four, six, seven, and nine are **dismissed without prejudice** against the City of Denver pursuant to *Heck*.  It is further

ORDERED that Defendant Lee Ingersoll's Motion to Dismiss First Amended Complaint [Docket No. 44] is **GRANTED IN PART** and **DENIED IN PART**.  It is further

ORDERED that Defendant City and County of Denver's Motion to Dismiss First Amended Complaint [Docket No. 45] is **GRANTED**.  It is further

ORDERED that claims one, two, three, five, and eight are **dismissed with prejudice** against the City of Denver.  It is further

ORDERED that the City of Denver is dismissed from this case.  It is further

ORDERED that Defendant Regional Transportation District's Motion to Dismiss Plaintiffs' First Amended Complaint and Jury Demand [Docket No. 47] is **GRANTED IN PART** and **DENIED IN PART**.  It is further

**ORDERED** that any claim for punitive damages against Regional Transportation

District is dismissed.


DATED March 15, 2023.


BY THE COURT:

PHILIP A. BRIMMER
Chief United States District Judge